**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARGARITA HERNANDEZ DE
ANDERSON,
                    *Petitioner,*

            v.

ALBERTO R. GONZALES, Attorney
General,
                    *Respondent.*

No. 05-74132

Agency No.
A19-921-652

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
October 19, 2006—San Francisco, California
Submission Withdrawn October 20, 2006
Resubmitted August 3, 2007

Filed August 9, 2007

Before: Susan P. Graber, William A. Fletcher, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge William A. Fletcher;
Partial Concurrence and Partial Dissent by Judge Tallman

**COUNSEL**

John Ayala and Alma Cobos-Ayala, Law Offices of Cobos & Ayala, Los Angeles, California, for the petitioner.

James E. Grimes and Mary Jane Candaux, Office of Immigration Litigation, Washington, D.C., for the respondent.

## OPINION

W. FLETCHER, Circuit Judge:

Margarita Hernandez de Anderson petitions for review of the Board of Immigration Appeals' ("BIA") dismissal of her appeal from an order of removal. She contends, first, that the BIA erred in holding that she failed to meet the requirements for termination of her removal proceedings under 8 C.F.R. § 1239.2(f). Second, she contends that the BIA's holding that she was ineligible to apply for suspension of deportation under former Immigration and Nationality Act ("INA") § 244(a)(2), 8 U.S.C. § 1254(a)(2) (repealed 1997), is an impermissibly retroactive application of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, div. C, 110 Stat. 3009. We agree with Petitioner's second contention and grant her petition.

## I. Background

Petitioner is a 64-year-old native and citizen of Mexico. She became a lawful permanent resident of the United States thirty-four years ago, on May 15, 1973, based on her marriage to a United States citizen whom she had met while she was living in Mexico.

On June 3, 1981, Petitioner shot her husband multiple times at close range, but did not kill him. Petitioner was charged under California law with attempted murder and with discharging a firearm at an inhabited dwelling. Petitioner's defense at trial was that she had shot her husband in self-defense. She testified that her husband was a heavy drinker

who had subjected her to years of abuse. At the time of the shooting, she was in the process of getting a divorce. She was staying in a women's shelter, but on the day of the shooting came back to the family home to retrieve some of her belongings. Petitioner testified that her husband threatened to "blow her brains out" and that she shot him in the driveway before he could get his gun from his car.

The jury declined to convict Petitioner of attempted murder. Instead, it returned convictions for attempted voluntary manslaughter, Cal. Penal Code § 192, and a firearm charge, *id*. § 246. Petitioner was sentenced to six years in prison. She was released in 1985 after serving four years. Petitioner successfully completed probation in 1987.

Since shortly after her release from prison, Petitioner has worked as a caregiver to home-bound ill and elderly patients. Her supervisor describes her as "a wonderful Christian person" and "truly a role model for what a good caregiver should be." She states that Petitioner is "so popular with . . . clients" that Petitioner is "busy to the point of having to turn work down." A letter from a family with whom Petitioner lived beginning in March 1985 "as part of her rehabilitation process" describes how they came to love and admire her: "We believe that she epitomizes the traits we all admire: trustworthiness, dedication to worthy goals, the ability to learn from experience, industriousness, self-reliance, or whatever else one may choose as attributes of a United States citizen[.]"

Since her release from prison in 1985, Petitioner has annually filed federal income tax returns. She co-owns a house in Hemet, California. She speaks, reads, and writes English. The government does not dispute that she has led a law-abiding life since 1981.

On August 2, 1995, twenty-two years after she became a lawful permanent resident and more than ten years after her release from prison in 1985, Petitioner filed an application for

naturalization. In the application she fully disclosed her 1981 criminal convictions. Petitioner had had no contact with the Immigration and Naturalization Service ("INS") either upon her release from prison in 1985 or in the ten years thereafter.[1]

Petitioner had been potentially eligible for naturalization as early as 1990. In 1990, a lawful permanent resident was eligible for naturalization after five years of continuous residence if, during that five-year period, the applicant could demonstrate that she "ha[d] been and still [was] a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States." 8 U.S.C. § 1427(a) (1990). Petitioner's 1981 convictions and term of imprisonment did not categorically preclude a finding of good moral character once five years had elapsed after her release from prison in 1985. *See* 8 U.S.C. § 1101(f) (1990); *Lopez-Castellanos v. Gonzales*, 437 F.3d 848, 851 & n.3 (9th Cir. 2006).

When Petitioner applied for naturalization in 1995, she had just become eligible to apply for suspension of deportation if the INS sought to deport her based on her convictions. *See* INA § 244(a)(2), 8 U.S.C. § 1254(a)(2) (1995) (repealed 1997). She had not been eligible to apply for suspension of deportation until ten years after her release from prison. *See id.* (requiring ten years of continuous presence and good moral character during that period for suspension of deportation); 8 U.S.C. § 1101(f)(7) (1990) (providing that good moral character cannot be established during a period of imprisonment longer than six months).

IIRIRA was enacted on September 30, 1996, more than a year after Petitioner filed her application for naturalization.

---

[1]The INS's functions were transferred to the Department of Homeland Security on March 1, 2003. *See* 6 U.S.C. § 542. Many of the events relevant to Petitioner's appeal occurred before March 1, 2003, and we refer to the agency as the INS when discussing those events.

IIRIRA's effective date was another six months later. *See* IIRIRA § 309(a). IIRIRA repealed "suspension of deportation" and replaced it with "cancellation of removal," a form of relief not available to Petitioner because she is an alien convicted of an aggravated felony. *See* 8 U.S.C. § 1229b(a)(3).

On August 3, 2000, five years after Petitioner filed her application for naturalization, the INS commenced removal proceedings against her. On the same day, the INS denied Petitioner's naturalization application based on the pendency of the newly instituted removal proceedings. Petitioner timely petitioned the INS for review of the denial of her naturalization application. One year later, on September 28, 2001, the INS denied the petition, again citing the pending removal proceedings.

In the meantime, on September 26, 2000, Petitioner had asked the immigration judge ("IJ") to terminate her removal proceedings under 8 C.F.R. § 1239.2(f) in order to allow her naturalization application to go forward. Petitioner contended that § 1239.2(f) authorized the IJ to determine that she was prima facie eligible for naturalization but for the pendency of the removal proceedings, even in the absence of a statement from the INS to that effect. Petitioner had requested such a statement from the INS District Director the day before, on September 25, 2000. The record does not contain a response from the District Director.

The IJ denied Petitioner's request to terminate the removal proceedings. On August 17, 2001, Petitioner applied to the IJ for suspension of deportation, arguing that IIRIRA's repeal of that relief was impermissibly retroactive as applied to her, given that she had applied for naturalization in 1995. The IJ held that Petitioner was removable under IIRIRA and that suspension of deportation was not an available form of relief. *Cf. Lopez-Urenda v. Ashcroft*, 345 F.3d 788, 791-92 (9th Cir. 2003) (as amended) (explaining that cases commenced by the

INS after April 1, 1997, are governed by IIRIRA's permanent rules).

The BIA dismissed Petitioner's appeal on December 10, 2003. The BIA rejected Petitioner's argument that the IJ erred in refusing to terminate the removal proceedings under § 1239.2(f), holding that Petitioner was required to establish prima facie eligibility for naturalization with a statement from the Department of Homeland Security ("DHS"), which had assumed the INS's functions earlier in 2003. The BIA also rejected Petitioner's argument that the repeal of suspension of deportation was impermissibly retroactive as applied to her.

Petitioner filed a timely petition for a writ of habeas corpus in the district court challenging her removal. The district court transferred the petition to this court pursuant to the REAL ID Act of 2005, Pub. L. No. 109-13, § 106(c), 119 Stat. 231, 311. We now treat Petitioner's request for relief as a petition for review of the BIA's decision. *See Rafaelano v. Wilson*, 471 F.3d 1091, 1095-96 (9th Cir. 2006). We have jurisdiction to review Petitioner's constitutional claims and other questions of law under 8 U.S.C. § 1252(a)(2)(D).

## II.    Standards of Review

We defer to an agency's interpretation of its own regulation when that interpretation is neither clearly erroneous nor inconsistent with the regulation. *See Singh-Bhathal v. INS*, 170 F.3d 943, 945 (9th Cir. 1999). We review de novo claims of due process violations in immigration proceedings. *See Simeonov v. Ashcroft*, 371 F.3d 532, 535 (9th Cir. 2004). We also review de novo whether an application of IIRIRA is impermissibly retroactive. *See Sinotes-Cruz v. Gonzales*, 468 F.3d 1190, 1194 (9th Cir. 2006). Because the BIA conducted its own review of the evidence and law rather than simply adopting the IJ's decision, "our review is limited to the BIA's decision, except to the extent the IJ's opinion is expressly

adopted." *Cordon-Garcia v. INS*, 204 F.3d 985, 990 (9th Cir. 2000).

## III.   Discussion

We review two holdings by the BIA. First, we review the BIA's holding that the IJ properly denied Petitioner's request for termination of removal proceedings under 8 C.F.R. § 1239.2(f). Second, we review its holding that IIRIRA's repeal of suspension of deportation is not impermissibly retroactive as applied to Petitioner.

### A.   Termination of Removal Proceedings

Petitioner contends that the BIA erred as a matter of law in holding that she was ineligible for termination of removal proceedings under 8 C.F.R. § 1239.2(f) because she had not established prima facie eligibility for naturalization by obtaining an affirmative statement to that effect from the DHS. Petitioner makes two arguments in support of her contention. First, she argues that, under a proper interpretation of § 1239.2(f), an IJ may determine that an alien in removal proceedings "has established prima facie eligibility for naturalization" even without a statement to that effect by the DHS. Second, she argues that, if § 1239.2(f) is interpreted to require that the DHS determine prima facie eligibility, the DHS has a "conflict of interest" that violates Petitioner's right to due process of law. We address these arguments in turn.

### 1.   Establishing Prima Facie Eligibility for Naturalization

**[1]** Until 1990, federal district courts considered naturalization applications in the first instance. The Immigration Act of 1990 transferred that authority from the district courts to the Attorney General. Pub. L. No. 101-649, § 401, 104 Stat. 4978, 5038; *see De La Bellajaro v. Schiltgen*, 378 F.3d 1042, 1045 (9th Cir. 2004). The Attorney General now has "sole authority to naturalize persons as citizens of the United States." 8

U.S.C. § 1421(a). That authority, which the Attorney General has delegated to the DHS, is limited by 8 U.S.C. § 1429, which states that "no application for naturalization shall be considered by the Attorney General if there is pending against the applicant a removal proceeding." We have stated that "[t]he natural reading of [§ 1429] is that removal proceedings and final removal orders are to take precedence over naturalization applications." *Perdomo-Padilla v. Ashcroft*, 333 F.3d 964, 970 (9th Cir. 2003).

Under certain circumstances, an IJ may terminate removal proceedings in order to allow an alien's naturalization application to go forward. The governing regulation is 8 C.F.R. § 1239.2(f), which provides:

> An immigration judge may terminate removal proceedings to permit the alien to proceed to a final hearing on a pending application or petition for naturalization when the alien has established prima facie eligibility for naturalization and the matter involves exceptionally appealing or humanitarian factors; in every other case, the removal hearing shall be completed as promptly as possible notwithstanding the pendency of an application for naturalization during any state of the proceedings.

In *Matter of Cruz*, 15 I. & N. Dec. 236 (BIA 1975), the BIA interpreted the "prima facie eligibility" requirement of 8 C.F.R. § 242.7(a), the predecessor to § 1239.2(f). The only material difference between the two versions is that § 242.7(a) used the pre-IIRIRA vocabulary, referring to "deportation proceedings" rather than "removal proceedings." *Compare Matter of Cruz*, 15 I. & N. Dec. at 236 (quoting 8 C.F.R. § 242.7(a) (1975)), *with* 8 C.F.R. § 1239.2(f) (2007). The BIA held in *Matter of Cruz* that aliens seeking termination of deportation proceedings under § 242.7(a) could establish prima facie eligibility for naturalization in two ways. They could obtain either "an affirmative communication from the

Service" or "a declaration of a [federal district] court that the alien would be eligible for naturalization but for the pendency of the deportation proceedings." *Matter of Cruz*, 15 I. & N. Dec. at 237. The BIA thus construed § 242.7(a) to require aliens to have established prima facie eligibility through methods outside the deportation proceedings. The BIA "decline[d] to entertain the question of whether an alien is eligible for naturalization" within the deportation proceedings because "neither we nor immigration judges have authority with respect to the naturalization of aliens." *Id.*

Following the transfer of authority over naturalization from the federal district courts to the Attorney General in 1990, several courts including our own have questioned the vitality of *Matter of Cruz*. In particular, we have questioned whether an alien still can obtain a declaration of prima facie eligibility from a district court. *De La Bellajaro*, 378 F.3d at 1047; *see also Zayed v. United States*, 368 F.3d 902, 907 & n.6 (6th Cir. 2004); *Apokarina v. Ashcroft*, 232 F. Supp. 2d 414, 417 (E.D. Pa. 2002); *Cuong Quang Le v. McNamee*, No. 06-CV-49-BR, 2006 WL 3004524, at *4-5 (D. Or. Oct. 20, 2006) (concluding court had no jurisdiction to declare alien prima facie eligible for naturalization).

**[2]** After we heard oral argument in Petitioner's case, the BIA reaffirmed its holding in *Matter of Cruz* that an alien must establish prima facie eligibility outside the removal proceedings. In *In re Acosta Hidalgo*, 24 I. & N. Dec. 103 (BIA 2007), the BIA held that, before seeking termination under § 1239.2(f), an alien must establish prima facie eligibility by obtaining an affirmative statement from the DHS. The BIA wrote that it was reaffirming this aspect of *Matter of Cruz* "[b]ecause the same circumstances that were present in *Matter of Cruz* still exist today." *Id.* at 106. That is, it remains true that "neither the Board nor the Immigration Judges have jurisdiction to determine an alien's eligibility for naturalization." *Id.* at 105-06. Therefore, the BIA concluded, "it is appropriate for the Board and the Immigration Judges to require some

form of affirmative communication from the DHS prior to terminating proceedings" under § 1239.2(f). *Id*. at 106.²

Petitioner does not challenge the validity of § 1239.2(f) itself. Rather, she argues that the BIA's interpretation of the regulation is erroneous. She points out that the regulation requires only that an applicant have "established prima facie eligibility for naturalization," and that it does not specify the means by which such prima facie eligibility is to be "established." Petitioner does not contend that the DHS cannot make such a determination. Rather, she argues that an IJ and the BIA should be able to do so as well.

In reviewing an agency's interpretation of its own regulation, "[o]ur task is not to decide which among several competing interpretations best serves the regulatory purpose." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). Rather, we defer to an agency's interpretation when that interpretation is neither "plainly erroneous [n]or inconsistent with the regulation." *Id*. (quotation marks omitted); *see also Singh-Bhathal v. INS*, 170 F.3d 943, 945 (9th Cir. 1999).

[3] We hold that the BIA's interpretation of § 1239.2(f) is not plainly erroneous. The text of the regulation does not specifically authorize IJs to evaluate prima facie eligibility. Rather, it requires only that an alien have "established" such eligibility: An IJ "may terminate removal proceedings . . . when the alien has established prima facie eligibility for natu-

---

²Without citing authority directly in support, the BIA asserts in *Acosta Hidalgo* that district courts "no longer have authority to make decisions as to an alien's prima facie eligibility for citizenship." *See* 24 I. & N. Dec. at 105. Because the question is not squarely presented in this case, we express no opinion concerning the BIA's assertion. We note, however, that district courts continue to have jurisdiction over at least some questions related to citizenship. *See* 8 U.S.C. §§ 1252(b)(5)(B), 1421(c), 1447(b); *see also United States v. Hovsepian*, 359 F.3d 1144, 1159-64 (9th Cir. 2004) (en banc) (discussing district courts' jurisdiction over naturalization applications).

ralization and the matter involves exceptionally appealing or
humanitarian factors." 8 C.F.R. § 1239.2(f). The juxtaposition
of the present perfect tense in "has established" and the pres-
ent tense in "and the matter involves" arguably implies that an
alien shall have established eligibility outside the removal
proceeding being conducted by the IJ. Thus, the BIA's inter-
pretation requiring an alien to have "established" eligibility
prior to, and outside, the proceedings with a statement by the
governmental authority responsible for considering natural-
ization applications is not a plainly erroneous interpretation of
the regulation.

**[4]** Nor is the BIA's interpretation of § 1239.2(f) in *Cruz*
and *Acosta Hidalgo* inconsistent with the purpose of the regu-
lation. Petitioner argues that requiring aliens to obtain state-
ments from the DHS in order to establish prima facie
eligibility for naturalization is inconsistent with § 1239.2(f)
because, by refusing to provide such statements, the DHS can
prevent IJs from exercising their discretion to terminate
removal proceedings. Such veto power is not inconsistent
with § 1239.2(f), however. The plain purpose of the regula-
tion is to allow the IJ discretion to terminate proceedings in
cases involving "exceptionally appealing or humanitarian fac-
tors," so that such aliens can apply for naturalization. 8 C.F.R.
§ 1239.2(f). If the DHS has already declined to state that an
alien is prima facie eligible for naturalization, terminating the
removal proceedings under § 1239.2(f) is likely to produce
unwarranted delay. In such circumstances, the DHS is virtu-
ally certain to deny naturalization, and then will be required
to recommence removal proceedings after that denial. Such
inefficiency would be inconsistent with § 1239.2(f), which
states that, "in every other case, the removal hearing shall be
completed *as promptly as possible*." (Emphasis added.)

## 2.   Due Process

Petitioner's second argument is that the DHS has a "con-
flict of interest" that violates due process. She contends that

a conflict arises where a single agency simultaneously performs the following roles: (1) commencing and prosecuting removal proceedings; (2) deciding whether to provide an affirmative statement that an alien is prima facie eligible for naturalization in order to permit termination of the removal proceedings; and (3) denying the alien's naturalization application based on the pendency of removal proceedings. Petitioner has cited no case law in support of her argument.

[5] In essence, Petitioner is arguing that the Attorney General and, derivatively, the DHS have been given too much authority over naturalization and removal decisions. Given Congress's " 'plenary' " power over immigration, and given the abstract form in which Petitioner's argument is presented to us, we cannot conclude that assigning to the DHS the various roles just described violates due process. *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1076 (9th Cir. 1998) (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972)).

## B.   Suspension of Deportation and Retroactivity

In *Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994), the Supreme Court reaffirmed that "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." Accordingly, " 'the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place,' " and " 'congressional enactments . . . will not be construed to have retroactive effect unless their language requires this result.' " *Id.* at 264-65 (quoting *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 855 (1990) (Scalia, J., concurring); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)).

The Supreme Court has set out a two-step analysis to determine whether a statute has an impermissible retroactive effect. We begin by determining whether " 'Congress has

expressly prescribed' " that the statute should apply retroactively. *Fernandez-Vargas v. Gonzales*, 126 S. Ct. 2422, 2428 (2006) (quoting *Landgraf*, 511 U.S. at 280). If there is such a clear indication from Congress, our analysis under *Landgraf* ends because "it is beyond dispute that, within constitutional limits, Congress has the power to enact laws with retrospective effect." *INS v. St. Cyr*, 533 U.S. 289, 316 (2001). If Congress has not clearly indicated its intent to apply a statute to prior conduct, however, we presume that the statute applies only prospectively. *Landgraf*, 511 U.S. at 280. Using that presumption, we then examine the statute to determine if its application impermissibly "impose[s] some burden on the basis of an act or event preceding the statute's enactment." *Fernandez-Vargas*, 126 S. Ct. at 2428.

In deciding Petitioner's retroactivity claim, we may readily dispose of *Landgraf*'s first step. We have already held that Congress did not clearly indicate that IIRIRA's repeal of suspension of deportation should operate retroactively. *Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 601 (9th Cir. 2002). Thus, after summarizing Petitioner's conduct in relation to the law as it stood prior to IIRIRA, we move to the second step of the *Landgraf* analysis, namely whether IIRIRA has an impermissible retroactive effect as applied to Petitioner.

### 1. Petitioner's Conduct

As recounted in greater detail above, Petitioner was granted lawful permanent resident status in 1973, thirty-four years ago, based on her marriage to a United States citizen. In 1981, Petitioner was convicted under California law of attempted voluntary manslaughter and discharge of a firearm. She was released from prison in 1985. Petitioner applied for naturalization in 1995. When she applied for naturalization, Petitioner was deportable based on her 1981 convictions. *See* 8 U.S.C. § 1251(a)(2) (1995).

By applying for naturalization, Petitioner affirmatively brought herself and her criminal convictions to the attention

of the INS. Confronted with Petitioner's application, the INS might simply have granted or denied the application. It also was possible, however, that the INS would not only deny Petitioner's application, but also decide to begin deportation proceedings against her.

Petitioner had been potentially eligible for naturalization as early as 1990, five years before the date of her application. As the law then stood, a lawful permanent resident was eligible for naturalization after five years of continuous residence if, during that five-year period, the applicant could demonstrate that she "ha[d] been and still [was] a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States." 8 U.S.C. § 1427(a) (1990); *see also* 8 C.F.R. § 316.2(a) (1995). Good moral character could not be established during periods of incarceration of more than six months. 8 U.S.C. § 1101(f)(7) (1990). Accordingly, Petitioner potentially could have satisfied the five-year moral character requirement for naturalization in 1990, five years after her release from prison in 1985. In assessing moral character, the INS was "not limited to reviewing the applicant's conduct during the five years immediately preceding the filing of the application." 8 U.S.C. § 1427(e) (1990). However, Petitioner's convictions did not categorically preclude a finding of good moral character. *See id.* § 1101(f); *Lopez-Castellanos*, 437 F.3d at 851 & n.3.

Because she did not apply for naturalization until 1995, five years after she first became potentially eligible, Petitioner had also, by the time of her application, become eligible to apply for suspension of deportation in the event that the INS, in response to her naturalization application, decided to commence deportation proceedings. Under INA § 244(a)(2), 8 U.S.C. § 1254(a)(2) (repealed 1997), Petitioner was eligible to apply for suspension of deportation if she could demonstrate ten years of continuous physical presence and good moral character. Because she could not establish good moral charac-

ter during her incarceration, Petitioner could not satisfy the ten-year character requirement until 1995, ten years after her release from prison in 1985. *See* 8 U.S.C. § 1101(f)(7) (1990).[3]

[6] On September 30, 1996, more than a year after Petitioner applied for naturalization, IIRIRA was enacted. Its effective date was six months later, on April 1, 1997. IIRIRA repealed suspension of deportation and replaced it with cancellation of removal, a form of relief not available to lawful permanent residents convicted of an aggravated felony. *See* 8 U.S.C. § 1229b(a)(3). Because Petitioner's 1981 attempted voluntary manslaughter conviction qualifies as an aggravated felony, she is not eligible for cancellation of removal. *See* 8 U.S.C. § 1101(a)(43)(F), (U); *United States v. Maria-*

---

[3]In a letter filed after oral argument in this case, the government contends that INA § 244(a)(2) requires that the ten-year continuous period of good moral character begin immediately after the commission of the crime. Because conduct during a period of incarceration longer than six months does not count toward a period of good moral conduct, the effect of the government's interpretation of the statute would be that no person incarcerated for a period longer than six months could ever establish good moral character in order to be eligible for suspension of deportation under INA § 244(a)(2). The government has cited no case to us in which either the BIA or any court has so held.

A BIA opinion, not cited by the government, is inconsistent with the government's position. In *Matter of Wong*, 12 I. & N. Dec. 721 (BIA 1968), the BIA counted the ten-year continuous period of good moral character backward from the date of application for suspension of deportation, rather than forward from the date of the crime. *Id.* at 724-25 ("The evidence of record affirmatively establishes that the respondent has been a person of good moral character for at least the ten years preceding his application for suspension of deportation."). To the same effect is a later Seventh Circuit opinion, *Rassano v. INS*, 492 F.2d 220 (7th Cir. 1974), also not cited by the government. *See id.* at 225 ("Petitioner had the burden of establishing that he was and now is a person of good moral character during the ten-year period as required in Section 1254(a)(2) . . . . [T]he Service concedes that this section is none too clear as to when the ten-year period is to begin. It concluded that Congress meant the period immediately preceding the date of the suspension application . . . ."). We therefore conclude that the government's reading of § 244(a)(2) is incorrect.

*Gonzalez*, 268 F.3d 664, 669 (9th Cir. 2001). Thus, if IIRIRA's repeal of suspension of deportation applies to Petitioner, she has lost the right to seek suspension of deportation — a right that she had when she applied for naturalization in 1995.

## 2. Analysis

At *Landgraf*'s second step, we apply a presumption against the statute's retroactive application. "The aim of the presumption is to avoid unnecessary *post hoc* changes to legal rules on which parties relied in shaping their primary conduct." *Austria v. Altmann*, 541 U.S. 677, 696 (2004). The presumption protects the "settled expectations" of individuals by giving them "an opportunity to know what the law is and to conform their conduct accordingly." *Landgraf*, 511 U.S. at 265.

The Court acknowledged in *Landgraf* that "deciding when a statute operates 'retroactively' is not always a simple or mechanical task." *Id.* at 268.

**[7]** Rather than providing a formula to apply at *Landgraf*'s second step, the Court has repeatedly instructed courts to make "a commonsense, functional judgment about whether the new provision attaches new legal consequences to events completed before its enactment." *St. Cyr*, 533 U.S. at 321 (internal quotation marks omitted) (quoting *Martin v. Hadix*, 527 U.S. 343, 357-58 (1999) (quoting *Landgraf*, 511 U.S. at 270)). This judgment "should be informed and guided by familiar considerations of fair notice, reasonable reliance, and settled expectations." *Id.* (internal quotation marks omitted) (quoting *Martin*, 527 U.S. at 358 (quoting *Landgraf*, 511 U.S. at 270)). *Landgraf* is frequently cited for the Court's paraphrase of Justice Story: A provision operates retroactively if it "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280; *see also id.* at 269. However, this list

of retroactive effects "merely describe[s] . . . *sufficient*, rather than . . . *necessary*, condition[s] for invoking the presumption against retroactivity." *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 947 (1997) (emphases in original).

The Court has twice considered aliens' claims that IIRIRA's repeal of relief from deportation was impermissibly retroactive as applied to them. In *St. Cyr*, the Court held that IIRIRA's repeal of waiver of deportation under INA § 212(c) is impermissibly retroactive as applied to aliens who pled guilty pursuant to plea agreements before the enactment of IIRIRA. 533 U.S. at 325-26. The Court wrote, "There can be little doubt that, as a general matter, alien defendants considering whether to enter into a plea agreement are acutely aware of the immigration consequences of their convictions." *Id.* at 322. The Court found the "potential for unfairness . . . significant and manifest" in the retroactive denial of defendants' eligibility for § 212(c) relief after the defendants gave up their right to go to trial based on the opportunity to apply for a waiver of deportation. *Id.* at 323. The Court wrote that "[t]here is a clear difference, for the purposes of retroactivity analysis, between facing possible deportation and facing certain deportation." *Id.* at 325 (citing *Hughes Aircraft*, 520 U.S. at 949; *Lindsey v. Washington*, 301 U.S. 397, 401 (1937)).

In the Court's second IIRIRA case, *Fernandez-Vargas*, the petitioner was an illegal reentrant whose United States citizen wife applied on his behalf for lawful permanent resident status in 2001, after IIRIRA had rendered him ineligible for adjustment of status. 126 S. Ct. at 2427. The Court held that IIRIRA was not impermissibly retroactive as applied to him because the "predicate action" to his removal was his "indefinitely continuing violation" in remaining in the country as an illegal reentrant since 1982, "not a past act that he [was] helpless to undo." *Id.* at 2432. IIRIRA did not impermissibly impose a "burden on the basis of an act or event preceding the statute's enactment" because a statute has an impermissible

retroactive effect only when applied to acts or events completed before the statute's enactment. *Id.* at 2428.

*St. Cyr* has produced considerable disagreement among the courts of appeal concerning whether "reasonable reliance" on pre-IIRIRA relief from deportation is a required element of a *Landgraf* claim to that relief and, if some form of reliance is required, what form it must take. *Compare Olatunji v. Ashcroft*, 387 F.3d 383, 393-94 (4th Cir. 2004) (holding that while "the presumption against retroactivity serves reliance *interests*, . . . reliance is not a *requirement* of retroactivity" because "the historical presumption against retroactive application of statutes did not require reliance" and "[n]either *Landgraf* nor subsequent Supreme Court authority imposes any such requirement" (emphases in original)), *and Atkinson v. Att'y Gen.*, 479 F.3d 222, 227-29 (3d Cir. 2007) (holding same), *with Hem v. Maurer*, 458 F.3d 1185, 1189 (10th Cir. 2006) (requiring a showing of "objective reliance," *i.e.*, that reliance would have been reasonable under the circumstances), *Wilson v. Gonzales*, 471 F.3d 111, 122 (2d Cir. 2006) (requiring evidence of reliance in the form of "categorical" "objective evidence that aliens who engaged in a course of action . . . 'almost certainly' relied reasonably on the continued availability of . . . relief" or in the form of an "individualized showing" of actual reliance), *and Carranza-de Salinas v. Gonzales*, 477 F.3d 200, 205 (5th Cir. 2007) (following Second Circuit case pre-dating *Wilson* in requiring "actual, subjective reliance on the pre-IIRIRA state of the law" in the sense that the applicant for relief "detrimentally changed his position in reliance on continued eligibility" or "actively engaged in conduct that reflect[ed] an intention to preserve [his] eligibility" (alterations in original) (internal quotation marks omitted) (quoting *Hernandez-Castillo v. Moore*, 436 F.3d 516, 519 (5th Cir. 2006) (quoting *Rankine v. Reno*, 319 F.3d 93, 99-100 (2d Cir. 2003)))); *see also Thaqi v. Jenifer*, 377 F.3d 500, 504 n.2 (6th Cir. 2004) (noting that "under *St. Cyr*, the [alien] need not demonstrate actual reliance upon the

immigration laws in order to demonstrate an impermissible retroactive effect").

**[8]** Expressly disapproving the conclusion of the Third and Fourth Circuits, this court has held that aliens claiming that IIRIRA's repeal of relief from deportation is impermissibly retroactive as applied to them must demonstrate reasonable reliance on pre-IIRIRA law. *Kelava v. Gonzales*, 434 F.3d 1120, 1124-25 & n.7 (9th Cir.) (as amended), *cert. denied*, 127 S. Ct. 43 (2006); *see also Saravia-Paguada*, No. 05-73098, 2007 WL 1462240, at *9 (9th Cir. May 21, 2007) (rejecting the petitioner's argument that this court's "emphasis on an alien's reasonable reliance on a prior law is inconsistent with Supreme Court precedent"). We have formulated this rule in the negative: Aliens making a *Landgraf* retroactivity argument cannot prevail if they " 'cannot plausibly claim that they would have acted . . . differently if they had known' about the elimination of [the] relief." *Kelava*, 434 F.3d at 1124 (quoting *Armendariz-Montoya v. Sonchik*, 291 F.3d 1116, 1121-22 (9th Cir. 2002)). Because our cases have not elaborated on how a petitioner may "plausibly claim" that she would have acted differently had she known about the impending change in the law, we turn for guidance to the reliance interests the Supreme Court has recognized under *Landgraf*.

**[9]** Where reliance on prior law has figured prominently in the Court's analysis of a *Landgraf* claim, the Court has considered whether reliance would have been objectively reasonable under the party's circumstances without asking whether the particular party did, in fact, act in reliance on the law. First, in *Martin*, the Court held that limits on attorneys' hourly fee rates imposed by the Prison Litigation Reform Act ("PLRA") did not apply to work performed before the passage of the PLRA. 527 U.S. at 347. The Court's discussion of the reliance interest was brief: "Respondents' counsel performed a specific task — monitoring petitioners' compliance with the court orders — and they were told that they would

be compensated at a rate of $150 per hour. Thus, when the lawyers provided these postjudgment monitoring services before the enactment of the PLRA, they worked in reasonable reliance on this fee schedule." *Id.* at 358. Deeming reliance on the fee schedule under such circumstances reasonable, the Court did not consider whether the attorneys actually did rely on the rate in the sense that they would not have performed the work had they known that they would be paid a lower rate.

Second, in *St. Cyr*, the Court analyzed St. Cyr's reasonable reliance on relief under former § 212(c) by reference to criminal aliens' circumstances generally, rather than evidence that St. Cyr himself actually relied on the availability of the relief in choosing to plead guilty. The Court reached this conclusion by finding that "*as a general matter*, alien defendants considering whether to enter into a plea agreement are acutely aware of the immigration consequences of their convictions," and that "preserving the possibility of such relief *would have been* one of the principal benefits sought by defendants deciding whether to accept a plea offer or instead to proceed to trial." 533 U.S. at 322-23 (emphases added). The Court held that the repeal of the relief was impermissibly retroactive as applied to all aliens in St. Cyr's position rather than only to St. Cyr himself: "We therefore hold that § 212(c) relief remains available for aliens, like respondent, whose convictions were obtained through plea agreements and who, notwithstanding those convictions, would have been eligible for § 212(c) relief at the time of their plea under the law then in effect." *Id.* at 326. Thus, *St. Cyr* is inconsistent with our pre-*St. Cyr* dictum that a criminal defendant would have to make "a specific factual showing that a plea was entered in reliance on the availability of discretionary waiver under § 212(c)" in order to establish a *Landgraf* claim to the relief. *Magana-Pizano v. INS*, 200 F.3d 603, 613 (9th Cir. 1999).

**[10]** As for the form reliance on prior law may take, the Court in *St. Cyr* held that there was reliance when defendants

entered plea agreements based in part on their then-existing right to apply for § 212(c) relief. However, *Landgraf* and *St. Cyr* make clear that entering into a quid pro quo exchange is not the sole form of reliance on prior law that can support a retroactivity claim. As an example of impermissible retroactivity affecting a right other than a contractual or property right, the Court in *Landgraf* cited *Chew Heong v. United States*, 112 U.S. 536 (1884), which held that "a provision of the 'Chinese Restriction Act' of 1882 barring Chinese laborers from reentering the United States without a certificate prepared when they exited this country . . . . did not bar the reentry of a laborer who had left the United States before the certification requirement was promulgated." *Landgraf*, 511 U.S. at 271. The Court in *Chew Heong* found the application of the Chinese Restriction Act impermissibly retroactive in part because of the laborers' justified reliance on prior law in departing the country: "[T]he plaintiff in error, having left before any certificate was permitted to be issued, cannot be required to produce one before re-entering, because, having resided here [under the prior law], he was clearly entitled . . . to go from and return to the United States of his own free will — a privilege that would be destroyed if its enjoyment depended upon a condition impossible to be performed." 112 U.S. at 560. The Court drew on *Chew Heong* again in *St. Cyr*, analogizing criminal aliens' reliance on § 212(c) when plea bargaining to the Chinese nationals' "reliance on the state of the law when they departed." 533 U.S. at 325 n.55.

We find persuasive the conclusion drawn from these cases by the Tenth Circuit. *Hem*, 458 F.3d at 1197. Summarizing, that court gave three reasons for its holding that "objectively reasonable reliance on prior law is sufficient to sustain a retroactivity claim":

> First, [an objective reliance] rule is more directly tied to the basic aim of retroactivity analysis: in determining whether it is appropriate to presume Congress concluded that the benefits of a new law

did not warrant disturbance of interests existing under prior law, it makes sense to look at the objective group-based interests that Congress could practically have assessed ex ante. Second, this rule is consistent with the Supreme Court's analyses in *Landgraf* and its progeny, none of which required actual reliance. Third, and most immediately pertinent here, the objective approach is consistent with the actual holding in *St. Cyr* — the Court's most reliance-focused decision — which precluded retroactive application of IIRIRA's elimination of § 212(c) eligibility to all aliens who reasonably could have relied on prior law when pleading guilty, rather than to just those aliens who actually did so rely.

*Id.*

As the Tenth Circuit recognized, *id.* at 1191, two members of a panel of this court had already come to the conclusion that the appropriate reliance test is one of "objective reliance." In *Garcia-Ramirez v. Gonzales*, 423 F.3d 935 (9th Cir. 2005) (per curiam), we held that our prior circuit precedent compelled the conclusion at *Landgraf*'s first step that Congress intended the IIRIRA provision at issue to apply retroactively; therefore, we did not reach *Landgraf*'s second step. *Id.* at 940. Two members of the panel wrote separately to state that, had they not been compelled by circuit precedent to hold that the petitioner's claim failed at the first step, they would have reached the second step and would have held that the statute's application to the petitioner was impermissibly retroactive. *Id.* at 941 (Fisher, J., concurring).

Regarding the reliance interest necessary at *Landgraf*'s second step in an IIRIRA case, the two panel members wrote:

> As in *St. Cyr*, . . . a finding of impermissible retroactivity here would not depend on Garcia-Ramirez

showing that she actually, subjectively relied on 8 U.S.C. § 1254(b)(2) when she departed the United States. *See St. Cyr*, 533 U.S. at 322-25 (presuming a *quid pro quo* without proof of actual reliance) . . . .

We would not dispense with the requirement of reasonable reliance. We simply find it to be objectively reasonable that an alien like Garcia-Ramirez, contemplating a trip outside the United States in 1989, could reasonably rely on the then-applicable legal standard not later being converted to one that automatically restarted the clock on her continuous presence because she exceeded the 90-day limit — a limit she could have stayed within had that been the rule at the time.

*Id*. at 946 (citations omitted); *see also Saravia-Paguada*, 2007 WL 1462240, at *7 (reasoning that reliance in the form of criminal conduct is "*per se* unreasonable").

**[11]** We now hold that individuals demonstrate reasonable reliance on pre-IIRIRA law and " 'plausibly claim that they would have acted . . . differently if they had known' about the elimination of [the] relief" if it would have been objectively reasonable under the circumstances to rely on the law at the time. *Kelava*, 434 F.3d at 1124 (quoting *Armendariz-Montoya*, 291 F.3d at 1121). Petitioner argues before this court, as she argued before the BIA and the IJ, that the "relevant past event" to which IIRIRA attached new legal consequences is her application for naturalization in 1995. *Landgraf*, 511 U.S. at 270. She argues that, when she applied for naturalization in 1995, she had a settled expectation in the existence of suspension of deportation and "implicitly rel-[ied]" on her eligibility for that relief.

In making our "commonsense, functional judgment" about whether IIRIRA's repeal of suspension of deportation is impermissibly retroactive as applied to Petitioner, we assume

that a lawful permanent resident applying for naturalization is, like an alien engaged in plea bargaining, "acutely aware of the immigration consequences" of her action. *St. Cyr*, 533 U.S. at 322. In Petitioner's case, those immigration consequences included placing at risk the life she had established as a lawful permanent resident in the United States. At the time of her application in 1995, Petitioner had been living in the United States as a lawful permanent resident for approximately twenty-two years. Since her release from prison in early 1985, she had worked as a caretaker for ill and elderly people, become a longstanding member of a church, and, in 1992, purchased a house. During this decade, she had not had any contact with immigration authorities.

Nevertheless, in 1995, Petitioner brought herself — and her criminal convictions — to the INS's attention by applying for naturalization. In so acting, she incurred the risk that the INS would choose to initiate deportation proceedings against her rather than grant her naturalization application. Petitioner's application for naturalization was a "completed" act for the purposes of retroactivity analysis. Having brought her convictions to the INS's attention, Petitioner could not subsequently withdraw them from scrutiny. Once she submitted her application, "there was no question of undoing" what she had done. *Fernandez-Vargas*, 126 S. Ct. at 2432. She had rung the bell; she could not unring it.

**[12]** As in *St. Cyr*, Petitioner acted at a time when the risk of deportation was lessened by the possibility of relief from deportation under the law as it then stood. In Petitioner's case, that relief was suspension of deportation under INA § 244(a)(2), 8 U.S.C. § 1254(a)(2) (repealed 1997). Petitioner first became eligible to apply for naturalization in 1990, when five years had passed since her release from prison in 1985. However, she did not apply for naturalization until 1995, by which time she had become eligible for suspension of deportation. Although Petitioner could not have been certain that she would be granted suspension of deportation if her natural-

ization application were denied and deportation proceedings were commenced, "[t]here is a clear difference, for the purposes of retroactivity analysis, between facing possible deportation and facing certain deportation." *St. Cyr*, 533 U.S. at 325.

**[13]** A "commonsense, functional judgment" leads us to conclude that a lawful permanent resident in Petitioner's position in 1995 would reasonably have relied on the existence of relief from deportation in applying for naturalization. A reasonable person in Petitioner's circumstances, "acutely aware of the immigration consequences" of her actions, would have known that waiting to apply for naturalization until ten years had elapsed after her release from prison — that is, waiting an additional five years after becoming eligible for citizenship — would insure that suspension of deportation would be available in the event the INS sought to deport her. In Petitioner's circumstances, it was objectively reasonable to wait the additional five years and to apply for naturalization only when that time had elapsed. The fact that Petitioner waited those five years reinforces our conclusion that Petitioner's submitting her application disclosing the criminal convictions for which she was deportable was an act of reasonable reliance on the availability of suspension of deportation. She can thus " 'plausibly claim that [she] would have acted . . . differently if [she] had known' about the elimination of § [244(a)(2)] relief," for which she had become eligible by the time she submitted her naturalization application. *Kelava*, 434 F.3d at 1124 (quoting *Armendariz-Montoya*, 291 F.3d at 1121).

In so concluding, we note that Petitioner's claim does not suffer from the defects we have previously identified in other aliens' arguments against retroactive application of IIRIRA under step two of *Landgraf*. First, because of Petitioner's objectively reasonable reliance on the availability of suspension of deportation, her claim is unlike the claims we have rejected for lack of objectively reasonable reliance. *See, e.g.,*

*Saravia-Paguada*, 2007 WL 1462240, at *8-10 (no reasonable reliance in committing the crime for which petitioner was removable); *Kelava*, 434 F.3d at 1125 (no reasonable reliance in engaging in terrorist activity); *Armendariz-Montoya*, 291 F.3d at 1121-22 (no reasonable reliance in committing crime or proceeding to trial rather than entering guilty plea).

**[14]** Second, Petitioner did not have fair notice that a change in the law would deprive her of the right to apply for suspension of deportation if the INS initiated deportation proceedings against her in response to her application for naturalization. Petitioner applied for naturalization on August 2, 1995, more than a year before the passage of IIRIRA, and an additional six months before IIRIRA took effect. *Cf. St. Cyr*, 533 U.S. at 314 (noting that St. Cyr entered his plea agreement in March 1996). Petitioner is thus not among those aliens who, following IIRIRA's passage and with notice of its effective date, applied for various forms of relief from deportation in the hope of taking advantage of certain more favorable pre-IIRIRA provisions before April 1, 1997. *See, e.g.*, *Ramirez-Zavala v. Ashcroft*, 336 F.3d 872, 873-74 (9th Cir. 2003) (alien's action after IIRIRA's passage but before its effective date); *Vasquez-Zavala v. Ashcroft*, 324 F.3d 1105, 1106 (9th Cir. 2003) (same); *Jimenez-Angeles*, 291 F.3d at 597 (same). Unlike those aliens, Petitioner had no notice, at the time she acted, that suspension of deportation would be repealed, thus leaving her without any possible relief from deportation.

Third, unlike aliens who were present illegally in the United States at the time of their ostensible "settled expectation," Petitioner was a lawful permanent resident at the time of her application and had held that status for twenty-two years. Even where there are grounds to seek deportation or removal, a lawful permanent resident is lawfully present in the United States until a final deportation or removal order is entered. *See* 8 C.F.R. § 1.1(p); *United States v. Reyna-Tapia*, 328 F.3d 1114, 1117 (9th Cir. 2003) (en banc). In 1995, the

INS had not sought to deport Petitioner for her criminal convictions; nor had the INS even contacted her. Petitioner's naturalization application was not a plea for mercy by someone illegally present in this country. Rather, it was an application for citizenship submitted by a lawful permanent resident who could reasonably rely on the law in existence at the time providing that she was eligible to be considered for both naturalization and suspension of deportation. *Compare St. Cyr*, 533 U.S. at 293 (lawful permanent resident), *with Ramirez-Zavala*, 336 F.3d at 873-74 (illegal alien), *Vasquez-Zavala*, 324 F.3d at 1106 (same), *and Jimenez-Angeles*, 291 F.3d at 602 (same).

Finally, at the time of her application in 1995, Petitioner was eligible to apply for suspension of deportation. She had accrued the necessary ten years of continuous presence and had reason to believe that she could demonstrate good moral character throughout that period as required for relief under former INA § 244(a)(2). Petitioner is thus unlike those aliens whose *Landgraf* claims failed because they were never eligible for relief before the passage of IIRIRA, and thus had no claim to a pre-IIRIRA reliance interest in the relief. *See, e.g.*, *Valencia-Alvarez v. Gonzales*, 469 F.3d 1319, 1327-28 (9th Cir. 2006) (finding no impermissible retroactive effect in the denial of pre-IIRIRA relief because the petitioner had not been in the United States long enough to qualify for the relief at the time of IIRIRA's passage).

**[15]** We therefore hold that applying IIRIRA's repeal of suspension of deportation to Petitioner "would have a retroactive consequence in the disfavored sense of 'affecting substantive rights, liabilities, or duties [on the basis of] conduct arising before [its] enactment.' " *Fernandez-Vargas*, 126 S. Ct. at 2428 (quoting *Landgraf*, 511 U.S. at 278 (alterations in *Fernandez-Vargas*)). To deny Petitioner the opportunity to apply for suspension of deportation would be inconsistent with the "[e]lementary considerations of fairness dictat[ing] that individuals should have an opportunity to know what the

law is and to conform their conduct accordingly." *Landgraf*, 511 U.S. at 265.

## Conclusion

**[16]** The BIA did not err in affirming the IJ's refusal to terminate Petitioner's removal proceedings under 8 U.S.C. § 1239.2(f). However, the BIA erred in holding that IIRIRA's repeal of suspension of deportation was not impermissibly retroactive as applied to Petitioner. We therefore grant the petition and remand to the BIA for further proceedings consistent with this opinion.

Petition **GRANTED** and **REMANDED.**

---

TALLMAN, Circuit Judge, concurring in part and dissenting in part:

Today the majority untethers our retroactivity jurisprudence in the criminal alien context from the mooring the Supreme Court established in *INS v. St. Cyr*, 533 U.S. 289 (2001). Because Congress has chosen to reduce immigration benefits available to aliens convicted of aggravated felonies, and the Supreme Court has given us the analytical guidance to evaluate the constitutional claims of those like petitioner who were convicted by juries, I would hold that Hernandez de Anderson has failed to establish a cognizable reliance interest sufficient to invalidate retroactive application of IIRIRA's cancellation of removal provision. I respectfully dissent.[1]

---

[1]I concur in the majority's conclusion that the BIA did not err in affirming the IJ's refusal to terminate Hernandez de Anderson's removal proceedings under 8 C.F.R. § 1239.2(f).

I

By shifting the focus away from the quid pro quo exchange inherent in a plea bargain—which was the lynchpin of the Supreme Court's analysis in *St. Cyr*—the majority crafts a holding that conflicts with our retroactivity jurisprudence in the criminal alien context. We have never before invalidated the retroactive application of IIRIRA where an alien made the conscious decision to proceed to trial. Indeed, where other circuits have been content to look elsewhere to establish reasonable reliance, our court has made clear that the retroactivity analysis, at least in the criminal alien context, begins and ends with whether the alien accepted a guilty plea in reliance on then-existing discretionary relief available at the time the decision to plead guilty was made.

In *Armendariz-Montoya v. Sonchik*, 291 F.3d 1116, 1121 (9th Cir. 2002), we held that an alien who chooses to go to trial "cannot plausibly claim that [he] would have acted any differently if [he] had known" about the elimination of § 212(c) relief. "Outside of the plea bargain context, however, we have declined to invalidate retroactive elimination of § 212(c) relief." *Saravia-Paguada v. Gonzales*, 488 F.3d 1122, 1131 (9th Cir. 2007). Indeed, in *Saravia-Paguada*, we made clear that *Armendariz-Montoya* "reaffirmed a narrow reading of *St. Cyr and excluded categorically claims for § 212(c) relief outside the guilty plea context*." *Id.* (emphasis added); *see also Kelava v. Gonzales*, 434 F.3d 1120, 1122-24 (9th Cir. 2006) (affirming *Armendariz-Montoya*'s reasoning and emphasizing that the *St. Cyr* Court was "concerned that the alien had detrimentally relied on the availability of § 212(c) relief in entering the plea, giving rise to 'settled expectations' that would be disrupted by the retroactive application of IIRIRA § 304(b)" (citing *INS v. St. Cyr*, 533 U.S. 289, 323-24 (2001))).[2]

---

[2]That this case involves suspension of deportation under § 244(a)(2), as opposed to waiver of inadmissibility under § 212(c), makes no difference.

Thus, to the extent that the opinion relies on extracircuit case law for a post-jury-conviction retroactivity analysis, it conflicts with our court's precedent. Moreover, it makes no difference that Hernandez de Anderson is a lawful permanent resident—as opposed to an alien residing illegally in the United States. Our language in *Armendariz-Montoya* and *Saravia-Paguada* was absolute; we carved out no exceptions based on the status of the particular alien. We stated simply that if an alien proceeded to trial, the retroactivity inquiry was at an end. In this case, Hernandez de Anderson took her chances at trial to defend against a murder charge, and she lost.[3] Congress has declared that suspension of deportation is no longer available to this class of aliens. I would go no further.

## II

Even if our precedents in this area of law permitted invalidation of IIRIRA retroactivity outside the plea bargain context, I would decline to do so on the grounds relied upon by the majority. The majority concludes that Hernandez de Anderson has established reasonable reliance sufficient to invalidate the retroactive application of IIRIRA's cancellation

---

The retroactivity principles are the same. Each is a form of discretionary relief altered by the enactment of IIRIRA and AEDPA. The majority would be hard pressed to find a meaningful distinction without undermining its own analysis, which relies heavily on multiple § 212(c) cases.

[3]The California Court of Appeal affirmed Hernandez de Anderson's conviction on appeal. In *Hem v. Maurer*, 458 F.3d 1185 (10th Cir. 2006) —a case cited by the majority to support its conclusion that an alien need only establish objective reliance—the Tenth Circuit invalidated retroactive application of IIRIRA to the class of "[a]liens who gave up their right to appeal their aggravated felony conviction when a successful appeal could have deprived them of § 212(c) eligibility." *Id.* at 1199. Because Hernandez de Anderson actually appealed her conviction, the *Hem* class is of no assistance to her. Indeed, in its haste to declare—for the first time in this circuit—that an alien need not show subjective reliance, the majority puts the cart before the horse. One must first establish a reasonable reliance interest before addressing whether that reliance must be subjective or objective.

of removal provision based on (1) her decision to wait five years before filing her naturalization application and (2) the fact that at the time of her filing she was eligible for suspension of deportation under pre-IIRIRA law. Op. at 9497-9501. Because neither rationale, on its own, suffices to establish reasonable reliance under our case law, cobbling them together does the majority no greater good. I address each ground in turn.

A

The majority makes much of Hernandez de Anderson's decision to wait to file her naturalization application until 1995 despite the fact that she was eligible for naturalization as early as 1990. The problem with this reliance argument is that at the time that Hernandez de Anderson purportedly chose to forgo filing her naturalization application, she was *not* eligible for suspension of deportation. Section 244(a)(2) was still on the books in 1990, but that made no difference in Hernandez de Anderson's situation. Thus, to the extent that she may have relied on its future availability when she decided to wait, she had no other choice. How did she rely to her detriment? In other words, what was available to her in 1990 that she gave up by waiting another five years? I can think of nothing.

Hernandez de Anderson's situation therefore is different from the guilty plea context because there the decision to enter a guilty plea and accept conviction results in detrimental consequences under subsequently enacted law. *St. Cyr*, 533 U.S. at 321-22. When we invalidate retroactive application of new laws, we ask, "Would the alien have accepted a guilty plea if he had known that his conviction would bar him categorically from certain discretionary relief in the future?" The answer typically is no, and we allow him to pursue relief under the old law. Here we ask, "Would Hernandez de Anderson have waited to file her naturalization application if she had known that suspension of deportation would not be avail-

able to her in the future?" Whether the answer is yes or no makes no difference because her decision not to file in 1990 resulted in no detriment. *See Kelava*, 434 F.3d at 1124 (noting the Supreme Court's emphasis on the petitioner's detrimental reliance in *St. Cyr*). For all practical purposes, she could have done nothing differently; her decision merely maintained the status quo of ineligibility.

The majority suggest that by filing her application Hernandez de Anderson risked awakening the sleeping bureaucratic giant who might then resolve to initiate deportation proceedings against her. But the INS could have done so at any time following her release from prison. That was a risk she always faced and one she could do absolutely nothing about other than pray that the knock on her door would never come.

As a result, Hernandez de Anderson's situation is also fundamentally different from those situations in which other circuits have invalidated retroactive application of AEDPA based on a delay in filing a § 212(c) application. *See, e.g.*, *Carranza-De Salinas v. Gonzales*, 477 F.3d 200, 206-10 & n.11 (5th Cir. 2007) (invalidating retroactive application of AEDPA where an alien was eligible for § 212(c) relief but deliberately chose to postpone filing in order to develop a stronger application); *Wilson v. Gonzales*, 471 F.3d 111, 113 (2d Cir. 2006) (same); *Restropo v. McElroy*, 369 F.3d 627, 637 (2d Cir. 2004) (same).[4] In *Restropo v. McElroy*, for example, the Second Circuit reasoned that "it is certainly plausible that aliens who decided to forgo affirmatively filing a 212(c) application would have acted differently if they had foreseen the AEDPA's enactment." *Id. Restropo* and its progeny actually undermine the majority's holding because in each case

---

[4]*Restropo*, *Wilson*, and *Carranza-De Salinas* each involved aliens who had been convicted after a jury trial—as opposed to a guilty plea. As a result, the petitioners were forced to identify a reliance interest separate from the quid pro quo exchange underlying *St. Cyr*.

the alien's decision affected the availability of relief *for which he or she was already eligible*. *See Carranza-De Salinas*, 477 F.3d at 202 ("[Petitioner] claims she did not immediately apply for § 212(c) discretionary relief after her [jury] conviction because she intended to apply . . . [when] she would be able to show a more extensive record of rehabilitation and community ties."); *Wilson*, 471 F.3d at 122 (noting that even though Wilson "could have filed an affirmative § 212(c) application," the record was unclear as to whether "he ever intended to do so"); *Restropo*, 369 F.3d at 637 ("Many [aliens in petitioner's position] might well have chosen affirmatively to file the 'weaker,' *but still valid*, application. To the extent that aliens like Petitioner *detrimentally* adapted their positions in reliance on their expectation of continued eligibility for 212(c) relief, the factors considered in [a previous Second Circuit case] appear to weigh against proscribing such relief retroactively." (emphasis added)). It may well be that the aliens in each of these cases would not have waited to file applications for § 212(c) relief if they had known that Congress would strip their eligibility for that form of relief.

Here, at the time of her alleged decision to wait, Hernandez de Anderson had *no* chance of relief via suspension of deportation. Had she been eligible for suspension of deportation in 1990 and made an analogous decision to strengthen her application, we might need to decide whether to extend our court's retroactivity analysis beyond the plea agreement context. But that is not the case before us.[5] The majority's emphasis on

---

[5]Hernandez de Anderson's decision to wait actually can be viewed as favorable, since she spent another five years free of adverse immigration proceedings. I find puzzling the opinion's assertion that Hernandez de Anderson somehow would have been significantly less likely to have brought her criminal convictions to the INS's attention by applying for naturalization if she had known that suspension of deportation was not available. The same can be said for *any* alien who seeks naturalization. At some point, they must come forward and reveal their criminal history. If naturalization was her goal, Hernandez de Anderson had no choice other than to reveal herself to INS. I find it difficult to invalidate retroactive

Hernandez de Anderson's choice to wait five years before applying for naturalization is therefore little more than a red herring.

## B

Removing from the retroactivity analysis Hernandez de Anderson's decision to wait five years before filing her naturalization application, the majority is left with nothing more than the act of her filing. While it is true that the law in effect at the time of her filing permitted discretionary relief in the form of suspension of deportation, we have held previously that an alien cannot establish impermissible retroactivity based merely on the decision to file. For example, in *Vasquez-Zavala v. Ashcroft*, 324 F.3d 1105 (9th Cir. 2003), we held that an illegal alien had no settled expectation that the former INS would initiate pre-IIRIRA deportation proceedings (as opposed to post-IIRIRA removal proceedings) following the denial of his asylum application based solely on the fact that he submitted his application prior to IIRIRA's effective date. *Id.* at 1108. We reasoned that "even if [Vasquez-Zavala] assumed that the application would be denied, any expectation that an INS action would thereafter commence could not support a sufficient expectation as to *when* it would commence." *Id.*; *see also Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 600 (9th Cir. 2002) (holding that IIRIRA applied to an alien who presented herself to the INS before IIRIRA's effective date in the hope of invoking pre-IIRIRA law). We reiterated the same logic in *Lopez-Urenda v. Ashcroft*, 345 F.3d 788, 794 (9th Cir. 2003), which also involved an alien who filed an asylum application before IIRIRA's enactment:

application of the cancellation of removal provision where the only option that an applicant passes up—in order to seek naturalization—is to remain in the United States as an anonymous but *deportable* alien. That is not detrimental reliance. It is the hope that INS will be too busy with others to pay attention to Hernandez de Anderson.

> Proceedings could have begun several months after [Lopez-Urenda] filed his application, in which case suspension of deportation would have remained a viable option; or they could have begun years later, as they did, at a time when the law had undergone significant change. That Lopez-Urenda did not know of the specific change—the enactment of IIRIRA and its permanent rules abolishing suspension of deportation—does not mean that he had a settled expectation that proceedings would commence before any such change took place.

*Id.*

In declining to invalidate the retroactive application of IIRIRA in *Lopez-Urenda*, we highlighted fundamental differences between the alien's situation in that case and the plea bargain context in *St. Cyr*:

> The concession of alienage in this case is not comparable to the numerous constitutional rights the petitioner in *St. Cyr* relinquished, including the right to trial by jury and all of its attendant safeguards. Similarly, any benefit the government may have gained in this case—such as the resources it saved in locating Lopez-Urenda and locating evidence to support its proceedings—are not so weighty as to create a settled expectation that suspension of deportation would remain available in exchange.

*Id.* at 796.

The same reasoning applies to Hernandez de Anderson; she simply cannot establish the quid pro quo recognized in *St. Cyr*. Invalidating retroactivity based merely on the act of filing prior to IIRIRA's effective date conflicts with our reasoning in *Lopez-Urenda*, *Jimenez-Angeles*, and *Vasquez-Zavala*.[6]

---

[6]Notably, our reasoning in these cases did not rely on the petitioners' status as illegal aliens. As such, Hernandez de Anderson's status as a law-

More importantly, holding that an alien can establish reasonable reliance based on nothing more than the date of filing would vitiate IIRIRA (and AEDPA) retroactivity altogether, allowing any alien who filed his application prior to the statutes' effective dates to claim an impermissible effect and seek protection from laws Congress repealed over ten years ago.

## III

Perhaps swayed by the sympathetic facts of this case, the majority has stretched our retroactivity doctrine in the criminal alien context beyond the bounds set by our precedent. I agree that Hernandez de Anderson's situation is certainly sympathetic. But one wonders whether the majority would have been so eager to rewrite our jurisprudence on less heart-wrenching facts. And while I share the majority's sympathy, I cannot join an opinion that grants relief at the expense of settled law. The majority opinion conflicts with our prior holdings restricting the retroactivity analysis in the criminal

---

ful permanent resident who filed a naturalization application (as opposed to an asylum application) does not undermine the binding force of these precedents. If anything, the fact that she filed a naturalization application makes Hernandez de Anderson's reliance argument even weaker than those put forth in our earlier cases, where the INS was under an affirmative obligation to initiate removal proceedings upon the denial of an asylum application. *See, e.g.*, *Vasquez-Zavala*, 324 F.3d at 1108 ("Petitioners observe that asylum is the only alien application that *necessarily* results in an INS action in the event it is denied. Unlike other alien applications, where, upon denial, the INS retains discretion to formally charge the alien, in asylum cases, the INS *must* refer the alien to deportation (pre-IIRIRA) or removal proceedings (IIRIRA) once the application is denied."). Hernandez de Anderson's argument that she should have the benefit of pre-IIRIRA suspension of deportation therefore rests on two separate assumptions: (1) the former INS's denial of her naturalization application and (2) its discretionary decision to initiate deportation/removal proceedings. *Cf. id.* (discounting petitioners' argument where it was based on the presumption that the application for discretionary relief—i.e., asylum—would be denied). I cannot support such an attenuated concept of "reasonable" reliance.

immigrant context to the quid pro quo exchange inherent in plea bargains where reasonable reliance can be shown. Because the majority's reasoning relies on inadequate grounds to establish the necessary reliance interest, I respectfully dissent.[7]

---

[7]Because I do not agree that Hernandez de Anderson has established a sufficient reliance interest, I would not reach the question of whether an alien must show objective or subjective reliance.