*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0260p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JOHN SHEWCHUN,

*Petitioner,*

v.

No. 09-3894

ERIC H. HOLDER, JR., Attorney General,

*Respondent.*

On Petition for Review from the
Board of Immigration Appeals.
No. A013 746 146.

Argued: July 27, 2011

Decided and Filed: September 8, 2011

Before: BOGGS, GILMAN, and COOK, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Maris J. Liss, GEORGE P. MANN & ASSOCIATES, Farmington Hills, Michigan, for Petitioner. Andrew Nathan O'Malley, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** George P. Mann, GEORGE P. MANN & ASSOCIATES, Farmington Hills, Michigan, for Petitioner. Jeffery R. Leist, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge. John Shewchun petitions this court for review of the Board of Immigration Appeals' (BIA's) dismissal of his appeal from the immigration judge's (IJ's) order of removal. Although Shewchun raised a number of substantive issues on appeal to the BIA, he presents only one of those issues to us:

1

whether the IJ and the BIA erred in rejecting his claim that his removal proceedings should be terminated based on his prima facie eligibility for naturalization under 8 C.F.R. § 1239.2(f). In addition, Shewchun asks us to review the following two procedural due process issues: (1) whether he is entitled to relief because he did not receive a final copy of the IJ's oral decision, and (2) whether the IJ should have recused herself based on her prior role as Chief Counsel in the Detroit District for Immigration and Customs Enforcement (ICE). Shewchun has also filed a motion to correct the administrative record in connection with his claim that he did not receive a proper transcript of the IJ's oral decision and a separate motion asking us to take judicial notice of various items that he claims support his argument. Assuming without deciding that we should take judicial notice of the facts that Shewchun has brought to our attention, we nevertheless **DENY** Shewchun's petition for review and **DENY** his motion to correct the administrative record.

## I. BACKGROUND

Shewchun is a citizen of Canada who was admitted to the United States in 1963 as a lawful permanent resident. He is a scientist in the field of alternative energy and has held academic positions at various universities in the United States. In 1983, Shewchun was convicted in Rhode Island of larceny and of taking money under false pretenses. He served four concurrent one-year suspended sentences for his four counts of conviction. A year after his Rhode Island conviction, in 1984, Shewchun was convicted in Florida on federal charges of mail and wire fraud. Both the Rhode Island and the Florida convictions arose out of his financial transactions with the universities that he was working for at the time. Shewchun was sentenced to 14 years in prison on the latter conviction, but he was released on parole in 1987 after serving approximately 3 years of his sentence. He was imprisoned for more than 2 additional years, from late 1992 to early 1995, for violating his parole.

In 1990, the former Immigration and Naturalization Service (the INS, the predecessor agency to the Department of Homeland Security (DHS)) issued an order to show cause, charging Shewchun with deportability under former § 241(a)(4) of the

Immigration and Nationality Act (the INA), 8 U.S.C. § 1251(a)(4) (1988) (currently 8 U.S.C. § 1227(a)(2)(A)(ii)) based on his having been convicted of two crimes involving moral turpitude not arising out of a single scheme.  Then, in 1997, the INS added the following two additional grounds supporting Shewchun's deportability under then INA § 241(a)(2)(A)(iii), 8 U.S.C. § 1251(a)(2)(A)(iii) (1994) (currently 8 U.S.C. § 1227(a)(2)(A)(iii)):  his having been convicted of (1) an aggravated-felony theft offense, and (2) an aggravated-felony fraud offense involving losses exceeding $10,000.

Elizabeth Hacker was the assigned IJ on Shewchun's case in 1995, but she recused herself because she recalled having discussed Shewchun's case with a former INS trial attorney in her previous capacity as the INS District Counsel in Detroit.  In 1997, the new IJ, Marsha Nettles, found that Shewchun was deportable because he had been convicted of two crimes involving moral turpitude and because his theft conviction constituted an aggravated felony.  But she determined that he was not deportable based on the INS's charge that he was convicted of a fraud offense involving over $10,000 in losses.

The BIA, in 2003, affirmed the IJ's determination that Shewchun was deportable for the reasons given.  But the BIA considered whether Shewchun might still be eligible for other forms of relief because the INA had previously granted the Attorney General broad discretion to waive the deportation of certain lawful permanent residents who were otherwise deportable for having committed various crimes.  *See INS v. St. Cyr*, 533 U.S. 289, 294-96 (2001) (interpreting former INA § 212(c)).  In *St. Cyr*, the Supreme Court held that the former INA § 212(c) continued to apply to aliens who pled guilty to crimes and who, "notwithstanding those convictions, would have been eligible for § 212(c) relief at the time of their plea under the law then in effect."  *Id.* at 326.  The BIA therefore remanded the case for the IJ to determine whether Shewchun was eligible for a waiver from deportation under the former § 212(c), or for any other applicable relief.

Before Shewchun's case was heard on remand, DHS added another ground of removability (formerly deportability) against him, charging that his 1984 conviction qualified as an aggravated felony under the INA because it constituted an attempt or

conspiracy to commit fraud or deceit involving over $10,000 in losses. This new charge was similar to the fraud charge that the IJ had previously dismissed, but the new charge alleged that Shewchun had attempted or conspired to commit a fraudulent act rather than that he actually committed the fraud. Although Shewchun argued before the BIA that DHS was precluded from bringing this new charge because of the IJ's earlier dismissal of a substantively similar charge, he does not raise that issue in his present appeal.

Also prior to Shewchun's case being heard on remand, he filed a motion seeking the recusal of IJ Nettles because she had served as Chief Counsel for ICE (a part of DHS) in Detroit from 2001 until 2005, when she became an IJ. Judge Nettles denied Shewchun's motion because she was not involved in his case as Chief Counsel, she had no knowledge of it, and his claim that she might have had some responsibility over the case was "too speculative and broad."

On remand, Shewchun requested several forms of relief pursuant to the BIA's order that permitted him to seek relief under former § 212(c) of the INA and on any other basis for which he was eligible. He sought (1) a waiver of removability under § 212(c), (2) to terminate his proceedings based on his pending application for naturalization pursuant to 8 C.F.R. § 1239.2(f), and (3) a waiver of removability under INA § 212(h) (which provides for the discretionary waiver of removability for certain aliens who were convicted of various crimes but who are otherwise eligible to apply for an adjustment of status). The IJ, in December 2007, denied all of Shewchun's claims for relief and concluded that, in addition to the already determined reasons for his removability, he was removable based on DHS's new aggravated-felony charge. According to the IJ, Shewchun was statutorily ineligible for a waiver of removability under either INA § 212(c) or § 212(h) because of his prior aggravated-felony convictions. The BIA agreed with the IJ's waiver-of-removability conclusions in July 2009, and Shewchun does not challenge them in the present appeal.

Shewchun's application to terminate his removal proceedings pursuant to 8 C.F.R. § 1239.2(f) is thus the only substantive claim that he raises in his petition for review. This regulation allows an IJ to terminate removal proceedings, thereby allowing

the alien to obtain a final hearing on a pending application for naturalization, if the alien "has established prima facie eligibility for naturalization and the matter involves exceptionally appealing or humanitarian factors." *Id.*

Shewchun's motion to terminate was rejected by the BIA because it had previously ruled in *In re Acosta Hidalgo*, 24 I. & N. Dec. 103 (BIA 2007), that IJs do not have the authority to make determinations concerning an alien's eligibility for naturalization. The BIA concluded that Shewchun was instead required to "establish his prima facie eligibility through an affirmative communication from [DHS]." And because Shewchun failed to provide the necessary proof, the BIA agreed with the IJ's denial of his motion. The BIA also rejected Shewchun's argument that *Acosta Hidalgo* was wrongly decided. Finally, the BIA found no merit in Shewchun's alternative claim that DHS had in fact confirmed his prima facie eligibility for naturalization.

## II. ANALYSIS

When an alien appeals from a final order of removal that is based on a criminal offense covered in INA § 237(a)(2)(A)(ii), 8 U.S.C. § 1227(a)(2)(A)(ii), such as Shewchun does here, we have jurisdiction to review only constitutional claims or questions of law. 8 U.S.C. § 1252(a)(2)(C)-(D). All three of Shewchun's claims are legal or constitutional claims and are therefore reviewable under 8 U.S.C. § 1252(a)(2)(D). *See Ikharo v. Holder*, 614 F.3d 622, 629 (6th Cir. 2010) (holding that the INA allows for judicial review of legal or constitutional claims arising out of final orders of removal for having committed various crimes specified by the statute).

"Where, as here, the BIA reviews the IJ's decision and issues a separate opinion, rather than summarily affirming the IJ's decision, we review the BIA's decision as the final agency determination." *Al-Ghorbani v. Holder*, 585 F.3d 980, 991 (6th Cir. 2009). "To the extent that the BIA has adopted the IJ's reasoning, however, we also review the IJ's decision." *Id.* "Questions of law are reviewed de novo, but substantial deference is given to the BIA's interpretation of the INA and accompanying regulations. The BIA's interpretation of the statute and regulations will be upheld unless the interpretation is

arbitrary, capricious, or manifestly contrary to the statute." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009) (citations and internal quotation marks omitted).

**A.     Termination of removal proceedings based on prima facie eligibility for naturalization**

Shewchun challenges the BIA's decision not to terminate his removal proceedings under 8 C.F.R. § 1239.2(f).  That provision reads as follows:

> An immigration judge may terminate removal proceedings to permit the alien to proceed to a final hearing on a pending application or petition for naturalization when the alien has established prima facie eligibility for naturalization and the matter involves exceptionally appealing or humanitarian factors; in every other case, the removal hearing shall be completed as promptly as possible notwithstanding the pendency of an application for naturalization . . . .

8 C.F.R. § 1239.2(f).

In *In re Acosta Hidalgo*, 24 I. & N. Dec. at 106, the BIA held that "it is appropriate for the [BIA] and the [IJs] to require some form of affirmative communication from the DHS prior to terminating proceedings based on [§ 1239.2(f)]." Shewchun argues, however, that *Acosta Hidalgo* was wrongly decided.  He further argues that although this court generally defers to the BIA's interpretation of the INA and its corresponding regulations, the BIA is not entitled to deference here because *Acosta Hidalgo* "violates the plain language of 8 C.F.R. § 1239.2(f)."

Shewchun reasons that *Acosta Hidalgo* incorrectly interpreted § 1239.2(f) because requiring an affirmative showing from DHS of prima facie eligibility for naturalization "depriv[es] aliens of their ability to meet the regulatory burden of [independently] establishing prima facie eligibility."  Under *Acosta Hidalgo*, according to Shewchun, aliens lack the ability to make this showing because the decision gives DHS the exclusive role of confirming the alien's status.

### *1.      Analysis of* **Acosta Hidalgo**

This court has not yet addressed the soundness of *Acosta Hidalgo*, although we questioned the continuing viability of a prior BIA decision reaching the same conclusion under an earlier statutory framework. *See Zayed v. United States*, 368 F.3d 902, 907 n.6 (6th Cir. 2004) (questioning whether *Matter of Cruz*, 15 I. & N. Dec. 236 (BIA 1975), which declined to consider the question of whether an alien is prima facie eligible for naturalization under the predecessor to § 1239.2(f), remains good law "notwithstanding the 1990 transfer of the naturalization power from the district courts to the Attorney General"). But all five of our sister circuits that have addressed challenges similar to Shewchun's have upheld *Acosta Hidalgo*'s interpretation of § 1239.2(f). *See Barnes v. Holder*, 625 F.3d 801, 808 (4th Cir. 2010); *Ogunfuye v. Holder*, 610 F.3d 303, 308 (5th Cir. 2010); *Zegrean v. Att'y Gen. of United States*, 602 F.3d 273, 274-75 (3d Cir. 2010); *Perriello v. Napolitano*, 579 F.3d 135, 142 (2d Cir. 2009); *Hernandez de Anderson v. Gonzales*, 497 F.3d 927, 933-34 (9th Cir. 2007).

These cases explain that Congress delegated to the Attorney General the "sole authority to naturalize persons as citizens of the United States," 8 U.S.C. § 1421(a), and that the Attorney General has, in turn, given this authority to DHS. *See, e.g.*, *Hernandez de Anderson*, 497 F.3d at 932-33. Moreover, "[t]he text of [§ 1239.2(f)] does not specifically authorize IJs to evaluate prima facie eligibility." *Id.* at 934. Shewchun argues that *Acosta Hidalgo* improperly strips the IJ of the regulatory discretion over whether to terminate removal proceedings under § 1239.2(f). But nothing in the regulation mandates that IJs have the authority to make this determination independent of DHS. In light of the statutory/regulatory framework, the BIA's view that § 1239.2(f) requires an alien to have established prima facie eligibility outside of removal proceedings "with a statement by the governmental authority responsible for considering naturalization applications is not a plainly erroneous interpretation of the regulation." *Hernandez de Anderson*, 497 F.3d at 934; *see also Barnes*, 625 F.3d at 805 ("Because § 1239.2(f) leaves open the question of who has the authority to make [the

prima-facie-eligibility] determination, we must defer to the BIA's gap-filling interpretation as long as it is not clearly erroneous.").

Shewchun claims that DHS lacks the resources, as well as any mechanism, to adjudicate prima-facie-eligibility determinations. He argues that placing the task of making this decision in the hands of DHS—the entity that initiates removal proceedings against aliens—"offends the most basic notions of due process" by leading to the absurd result of "assigning DHS to the dual role of prosecutor and adjudicator." But the Ninth Circuit persuasively addressed this concern by explaining that because Congress has "plenary" authority over immigration, the court could not conclude that assigning these roles to DHS violates due process. *Hernandez de Anderson*, 497 F.3d at 935; *see also Kleindienst v. Mandel*, 408 U.S. 753, 769-70 (1972) ("[P]lenary congressional power to make policies and rules for exclusion of aliens has long been firmly established.").

Moreover, Congress has specifically "accord[ed] priority to removal proceedings" over naturalization proceedings. *See Zayed*, 368 F.3d at 905 (explaining that 8 U.S.C. § 1429's prohibition on the consideration of naturalization applications while removal proceedings are pending was intended to end the "race between the alien to gain citizenship and the Attorney General to deport him" (quoting *Shomberg v. United States*, 348 U.S. 540, 544 (1955)); *see also Hernandez de Anderson*, 497 F.3d at 933 (concluding that § 1429 gives removal proceedings precedence over naturalization applications). Allowing DHS to have such a high level of control over an alien's removal proceedings is thus consistent with the current statutory framework of immigration law.

Shewchun counters the reasoning in *Acosta Hidalgo* that IJs and the BIA lack the necessary expertise to make naturalization determinations by arguing that they both make similar determinations in other contexts and are thus no less qualified than DHS officers, who are not required to be lawyers, to make decisions regarding prima facie eligibility for naturalization. In support of this argument, Shewchun asks us to take judicial notice of two U.S. Citizenship and Immigration Services (USCIS) publications that set out the standard for naturalization determinations. But even assuming that IJs

and the BIA are fully qualified to make such determinations, that *capability* does not alter the deference owed to the BIA's interpretation of the *authority* that the plain language of the statutory/regulatory framework delegates to each actor. *Zegrean*, 602 F.3d at 275 (holding that the "issue of expertise aside, we owe deference to the BIA's conclusion as to the scope of its jurisdiction since, whether it was interpreting a statute or a regulation," its view was not plainly erroneous). In other words, even if we assume that IJs and the BIA are capable of determining whether an alien is prima facie eligible for naturalization, the relevant question is whether they have been granted the authority to do so.

### 2.     *Prima facie versus final eligibility determinations*

All of our sister circuits that have dealt with this issue agree that IJs do not have the authority to make assessments of prima facie eligibility under § 1239.2(f). But some confusion remains regarding whether DHS has the discretionary authority to issue an opinion concerning an alien's prima facie—as opposed to conclusive—eligibility for naturalization once removal proceedings have begun. Congress has prescribed that "no application for naturalization shall be considered by the Attorney General if there is pending against the applicant a removal proceeding pursuant to a warrant of arrest." 8 U.S.C. § 1429.

The Second Circuit concluded in *Perriello v. Napolitano*, 579 F.3d 135 (2d Cir. 2009), that this statutory bar makes it "impossible for an alien to establish prima facie eligibility for naturalization" while removal proceedings are pending because DHS—the alien's only recourse for such determinations—is prohibited from making a decision on the issue during the pendency of the removal proceedings. *Id.* at 141-42. According to this view, § 1239.2(f) "now conflicts, at least in part," with 8 U.S.C. § 1429. *Id.* at 142; *see also Zegrean*, 602 F.3d . at 274-75 (reaching the "awkward if not altogether unworkable result" that "because petitioner had applied for naturalization after the removal proceedings against him had commenced, it was impossible for him to establish eligibility for naturalization"). These courts nevertheless concluded that the BIA's interpretation is not "plainly erroneous nor inconsistent with the regulation," and thus

left to Congress and DHS the task of reconciling the regulation with the statute. *Perriello*, 579 F.3d at 142 (alterations and internal quotation marks omitted); *Zegrean*, 602 F.3d at 275.

Shewchun suggests that although DHS has "ultimate jurisdiction to adjudicate the merits of the [alien's] naturalization application," the regulation still affords the IJ the authority to assess the preliminary issue of prima facie eligibility for naturalization. He argues that the Second and Third Circuits render the regulation, as interpreted by *Acosta Hidalgo*, obsolete. Shewchun thus urges us to adopt his interpretation, which allows for the regulation to coexist with the statute, instead of deferring to the BIA's position in *Acosta Hidalgo*.

But even if aliens are unable to obtain a determination from DHS regarding prima facie eligibility while removal proceedings are pending, the Ninth Circuit has suggested that they might be able to receive that information prior to the commencement of removal proceedings. *Hernandez de Anderson*, 497 F.3d at 934. Alternatively, the Fourth Circuit has suggested that "[t]he juxtaposition of § 1239.2(f) and § 1429 leaves room for the possibility . . . that DHS could make a prima facie determination without actually considering an alien's application." *Barnes v. Holder*, 625 F.3d 801, 807 (4th Cir. 2010) (noting that the government confirmed this ability at oral argument).

The Fourth Circuit's understanding comports with the statutory language that "the findings of the Attorney General in terminating removal proceedings[,] or in canceling the removal of an alien pursuant to the provisions of this chapter, shall not be deemed binding in any way upon the Attorney General with respect to the question of whether such person has established his eligibility for naturalization." 8 U.S.C.§ 1429. This language, in the very same provision that prohibits the consideration of naturalization applications while removal proceedings are pending, seems to acknowledge that preliminary naturalization determinations can be made during removal proceedings, but sets out that those preliminary (or prima facie) determinations are distinct from the ultimate merits of an application for naturalization.

In other words, although the statute prohibits DHS from considering naturalization *applications* while removal proceedings are pending, DHS might still be permitted to assess whether an alien is prima facie eligible for naturalization insofar as that decision affects the IJ's separate consideration of whether to terminate the alien's pending removal proceedings. And because § 1429 mandates that this preliminary determination will not be binding on DHS's subsequent consideration of the alien's application for naturalization, § 1429 does not preclude DHS from making the prima facie determination.

We find merit in the Fourth Circuit's approach that recognizes the possibility that an alien in removal proceedings with a pending application for naturalization may obtain a prima facie determination from DHS even though the merits of the application cannot be reached until the removal proceedings are concluded. But Shewchun contends that this interpretation still places an alien at the whim of DHS, which currently has no formal mechanism in place for making such determinations. We are sympathetic to Shewchun's argument that because 8 C.F.R. § 1239.2(f) grants to the IJ the authority to terminate removal proceedings, DHS—the very party seeking Shewchun's removal—should not have the power to unilaterally prevent his removal proceedings from being halted under this regulation. Shewchun's argument fails, however, because "[a]bsent the implementation by DHS of its regulation, § 1239.2(f), such an alien would not have any possibility of review. Therefore we find it reasonable that DHS would have the authority to limit the scope of such discretionary relief, which is only available by virtue of its own regulation." *Barnes*, 625 F.3d at 807 n.3.

We must also be mindful of the "substantial deference" that we owe to the BIA's interpretations of the INA and its accompanying regulations. *See Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009) (holding that the BIA's interpretation will be upheld unless it is "arbitrary, capricious, or manifestly contrary to the statute" (internal quotation marks omitted)). In sum, we conclude that the interplay between 8 U.S.C. § 1429 and 8 C.F.R. § 1239.2(f) does not detract from the deference that we owe the BIA's interpretation in *Acosta Hidalgo*.

**3.      The IJ's authority to make preliminary "portability" determinations in the adjustment-of-status context**

Shewchun responds by attempting to analogize his situation to a parallel line of cases where an IJ has been found to have the authority to deal with an alien's work visa in the course of deciding whether to adjust the alien's status during removal proceedings. In these cases, various courts of appeals have reversed the BIA's determination that an IJ lacks the authority to determine whether an alien in removal proceedings, who seeks an adjustment of status based on employment in the United States, is eligible to have his or her petition for a work visa remain valid under 8 U.S.C. § 1154(j) (INA § 204(j)) where the alien changes jobs while his or her application is pending. This statute provides that if an alien's application for adjustment of status has remained pending for 180 days or more, the alien's petition for a work visa "shall remain valid with respect to a new job . . . if the new job is in the same or a similar occupational classification as the job for which the petition was filed." *Id.* This court has referred to § 1154(j) as the "portability" provision because it allows for the portability of the alien's application across different jobs. *See Matovski v. Gonzales*, 492 F.3d 722, 725 (6th Cir. 2007).

In *Matovski*, this court noted that the BIA's determination that DHS had the sole authority to assess portability would "effectively eliminate[]" the ability of aliens in the relevant removal proceedings to avail themselves of the provision. *Id.* at 735. The Fourth Circuit, in a similar case, explained that requiring a portability determination from DHS rather than from the IJ while an alien is in removal proceedings effectively denies the alien the statutory provision's protection because an alien in removal proceedings "must seek administrative closure of the removal proceedings [in order to] ask DHS to determine the continuing validity of his visa petition pursuant to § 204(j)." *Perez-Vargas v. Gonzales*, 478 F.3d 191, 195 (4th Cir. 2007).

An alien's predicament in these portability situations thus appears on the surface to be similar to Shewchun's in the present case. In both scenarios, because administrative closure or termination of removal proceedings requires the consent of DHS, the alien's access to the portability or termination provision lies within the

discretion of the government.  *See id.*  "If DHS were to refuse the alien's request for [closure or termination,] the alien would be unable to avail himself of the process which Congress provided."  *Id.*  Shewchun argues that just as the BIA in these cases erroneously allowed DHS to have "unfettered discretion" to make the portability determination, the BIA in *Acosta Hidalgo* incorrectly allowed DHS to have absolute authority in determining whether an alien's removal proceedings should be terminated under 8 C.F.R. § 1239.2(f).

But Shewchun's argument is unavailing because the ability of aliens in removal proceedings to benefit from the portability provision is premised on Congress's purpose of  providing "job flexibility for long delayed applicants" regardless of whether the aliens are filing an initial application with DHS or are submitting an application in the context of removal proceedings before an IJ.  *See Matovski*, 492 F.3d at 736; *see also Perez-Vargas*, 478 F.3d at 195 (holding that the plain language of the statute "applies to all aliens who have an application for adjustment of status pending and who otherwise satisfy the statute's terms").  "Congress never distinguished between aliens filing an initial application with the DHS," who could obtain the portability assessment directly from DHS, "and those aliens renewing their applications in removal proceedings before an Immigration Judge."  *Matovski*, 492 F.3d at 736.  Here, in contrast, Congress has expressly prioritized removal proceedings over naturalization proceedings.  *See Zayed v. United States*, 368 F.3d 902, 905 (6th Cir. 2004); *see also Hernandez de Anderson v. Gonzales*, 497 F.3d 927, 933 (9th Cir. 2007).  DHS's ability to prevent an alien from halting ongoing removal proceedings in order to adjudicate a pending application for naturalization is therefore consistent with Congress's statutory scheme.

### 4.        *An IJ's authority to make preliminary family-based visa determinations in the adjustment-of-status context*

Shewchun also relies on two cases involving aliens seeking to avoid removal through family-based applications for adjustment of status.  He points out that although IJs lack the authority to decide the merits of family-based visa petitions, they still have the power to consider whether such a visa petition for an alien relative is "prima facie

approvable" when "determining whether to continue removal proceedings pending final adjudication of an I-130 [family-based visa petition] filed in conjunction with an adjustment application." *Matter of Hashmi*, 24 I. & N. Dec. 785, 790 (BIA 2009). Just as the IJ has the authority to make this prima facie determination concerning family-based visa petitions, Shewchun argues that the IJ should also be able to determine the alien's prima facie eligibility for naturalization.

Shewchun also compares the present case to the decision of whether to grant a motion to reopen removal proceedings so that the alien can pursue an adjustment of status due to a pending family-based visa petition where the alien's marriage was entered into after the commencement of removal proceedings. In this situation, the IJ or the BIA may not deny the alien's motion to reopen solely based on the fact that DHS opposes the motion. *Sarr v. Gonzales*, 485 F.3d 354, 363 (6th Cir. 2007). The IJ must instead consider a number of factors in deciding whether to grant the motion to reopen, including whether "the motion presents clear and convincing evidence indicating a strong likelihood that the respondent's marriage is bona fide." *Id.* (internal quotation marks omitted). So too in the present case, according to Shewchun, DHS should not be able to unilaterally prevent the alien from being able to pursue naturalization while in removal proceedings.

But just as Shewchun's comparison of the present case to the portability context is without merit, he ignores the "the significant interest at stake" where aliens seek to adjust their status based on "the chance to acquire lawful permanent resident status through a family-based visa petition." *Matter of Hashmi*, 24 I. & N. Dec. at 790. Congress specifically added § 245(e)(3) of the INA (codified at 8 U.S.C. § 1255(e)(3)) to allow aliens who do not get married until after removal proceedings have commenced to have "one opportunity to present clear and convincing evidence of the bona fides of the marriage." *Melnitsenko v. Mukasey*, 517 F.3d 42, 51 (2d Cir. 2008) (internal quotation marks omitted). This deference to bona fide marriages is in sharp contrast to the statutory preference of removal proceedings over naturalization proceedings. *See* 8 U.S.C. § 1429.

### 5.     *Judicial notice of pending administrative-closure cases*

Shewchun attempts to compare his situation to one more scenario: the administrative closure of removal proceedings.  This mechanism is used to temporarily remove the case from an IJ's calendar or from the BIA's docket.  *See In re Gutierrez-Lopez*, 21 I. & N. Dec. 479, 480 (BIA 1996).  Administrative closure "does not result in a final order.  It is merely an administrative convenience which allows the removal of cases from the calendar in appropriate situations." *Id.*  Shewchun asks us to take judicial notice of two separate appeals dealing with this issue that his attorney currently has pending before this court, captioned *Cisneros v. Holder* and *Bermudez v. Holder*, Nos. 10-4014/4015, respectively.

His attorney argues in these separate cases, based on *Matter of Hashmi*, 24 I. & N. Dec. 785 (BIA 2009), that this court should overrule the BIA's current position that both the alien and the DHS must consent before removal proceedings may be administratively closed.  *See Matter of Lopez-Barrios*, 20 I. & N. Dec. 203, 204 (BIA 1990) (reflecting the current policy).  Shewchun also points out that an appeal encompassing this issue is currently pending before the BIA.  He suggests that just as DHS should not have the unilateral authority to prevent the administrative closure of removal proceedings, it also should not be able to singlehandedly prevent the termination of removal proceedings under 8 C.F.R. § 1239.2(f).

To the extent that Shewchun seeks to incorporate here the legal arguments that his attorney has made in a totally separate appeal, which he was fully capable of making in his briefs in the present case, that is not an appropriate basis for judicial notice.  *See Toth v. Grand Trunk R.R.*, 306 F.3d 335, 349 (6th Cir. 2002) ("Thus, judicial notice is generally not the appropriate means to establish the legal principles governing the case.").  Shewchun's request might also be construed as asking us to be cognizant of the fact that this court or the BIA might issue decisions in the near future that alter DHS's current control over the administrative closure of removal proceedings.  But we see no more analogy between that situation and the one before us here than we do with the other comparisons that Shewchun has presented to us.  We will therefore proceed with the

disposition of the present case without concern for what might subsequently be decided concerning the administrative closure of removal proceedings.

**B.      Affirmative showing from DHS of prima facie eligibility for naturalization**

Shewchun alternatively argues that he has in fact presented affirmative evidence that DHS recognizes his prima facie eligibility for naturalization, as is required by § 1239.2(f). He references two DHS I-797C Notice of Action documents. One of these documents informed him that DHS had received his application for naturalization. The other sought to schedule having his biometric data recorded. Shewchun also points to DHS's Naturalization Document Request, which alerted him to the requirement that he bring additional documents to his eventual interview that were not included in his application.

The BIA concluded that these documents are "not an affirmative communication from DHS as to the respondent's prima facie eligibility for naturalization as is required" by 8 C.F.R. § 1239.2(f). We agree. The documents offered by Shewchun in support of this claim amount to no more than DHS's standard operating procedure in processing an application for naturalization.

Shewchun also contends that his argument is supported by the testimony of Thomas Brownrigg, USCIS adjudication officer. Brownrigg was asked at the hearing before the IJ whether USCIS's initial acceptance of a naturalization application would "be kind of like a prima facie eligibility that this is the right application, the right fee and the documents are attached, is that pretty much the extent of the [intake review]?" He agreed. But this question clearly dealt with USCIS's initial processing of applications rather than a determination of prima facie eligibility for naturalization under 8 C.F.R. § 1239.2(f). Brownrigg subsequently stated that he did not know of any procedure by which someone in removal proceedings could obtain a determination from USCIS as to whether he or she is prima facie eligible for naturalization. The IJ thus properly decided that Brownrigg "was unfamiliar with [Shewchun's] case and the specific substantive regulatory provisions that would govern [prima facie] eligibility." Morever, we agree

with the IJ's conclusion that Shewchun "failed to provide the necessary proof, through an affirmative communication from DHS, of [his] prima facie eligibility."

Shewchun's lack of success with Brownrigg's testimony prompted him to request a subpoena for a second, unspecified DHS officer to testify about whether Shewchun was prima facie eligible for naturalization. But the government points out, and Shewchun does not dispute, that he made this subpoena request five months after the IJ had closed the evidentiary record. *See* 8 CFR § 1003.31(c) ("If an application or document is not filed within the time set by the Immigration Judge, the opportunity to file that application or document shall be deemed waived."). The IJ denied Shewchun's request.

We review de novo whether the IJ's denial of Shewchun's request for a second subpoena rendered his proceedings so fundamentally unfair that it violated his due process right to reasonably present his case. *See Hassan v. Gonzales*, 403 F.3d 429, 436 (6th Cir. 2005) (assessing whether an alien had good cause under the Due Process Clause for submitting evidence after the IJ's filing deadline). Shewchun argued that the second subpoena was necessary because DHS would otherwise have the power to prevent the termination of removal proceedings under 8 C.F.R. § 1239.2(f) by simply refusing to opine on whether an alien is prima facie eligible for naturalization. As explained above, however, DHS has no obligation to attest to whether an alien is prima facie eligible for naturalization under 8 CFR § 1239.2(f). We therefore cannot say that the IJ's refusal to grant Shewchun's request to subpoena an unidentified DHS employee five months after the record was closed, and after Brownrigg already gave extensive testimony on Shewchun's status, violated Shewchun's due process rights.

## C.     Final transcript of the IJ's decision

Shewchun also raises the procedural issue, in both his opening brief and in his motion to correct the administrative record, that he allegedly received only the preliminary copy rather than the approved, edited, and signed copy of the transcript of the IJ's oral decision. He correctly points out the general rule set forth in 8 C.F.R. § 1003.5(a) that "[w]here transcription of an oral decision is required, the immigration

judge shall review the transcript and approve the decision within 14 days of receipt" of the petitioner's appeal.  And, more fundamentally, "[d]ue process demands a reasonably accurate and complete transcript to allow for meaningful appellate review and to allow the alien to mount a challenge to the proceedings conducted before the IJ."  *Sterkaj v. Gonzales*, 439 F.3d 273, 279 (6th Cir. 2006).

But "a mere failure of transcription, by itself, does not rise to a due process violation."  *Garza-Moreno v. Gonzales*, 489 F.3d 239, 241 (6th Cir. 2007) (internal quotation marks omitted).  A petitioner provided with an inaccurate or incomplete transcript bears the heavy burden of proving prejudice in order to show a due process violation in an immigration hearing.  *Id.* at 241-42.  The petitioner "must show that a complete and accurate transcript would have changed the outcome of the case."  *Id.* at 242 (internal quotation marks omitted).

Shewchun argues that we should reconsider our decision in *Garza-Moreno* based on new arguments that the court did not consider in that opinion.  He points to the importance that the Department of Justice (DOJ) places on 8 C.F.R. § 1003.5, as evidenced by the DOJ's statements "that substantial delay in the production of transcripts in many cases has been a serious problem," and that the DOJ "is confident that the [IJs] will be able to adjust their schedules to accommodate" the new timeline.  Board of Immigration Appeals:  Procedural Reforms to Improve Case Management, 67 Fed. Reg. 54878-01, 54895 (Aug. 26, 2002).  But this court has previously noted that, although

> we are cognizant of the dangers in an oral opinion that is forwarded for review without an examination for errors in transcription and have deemed it extremely poor practice not to provide the parties with the corrected version of the IJ's decision when it was corrected[,] . . . minor clerical changes or transcription errors in an uncorrected decision are not tantamount to the deprivation of due process absent a showing of prejudice.

*Bulatovic v. Holder*, 351 F. App'x 978, 983-85 (6th Cir. 2009) (internal quotation marks omitted)  (citing *Garza-Moreno*, 489 F.3d at 241).

The importance of IJs furnishing a corrected transcript of their decisions in a timely manner thus does not change our prior determination that an IJ's failure to do so, absent a showing of prejudice, does not constitute a per se deprivation of due process. *Garza-Moreno*, 489 F.3d at 241-42. We continue, however, to be critical of failures to timely supply petitioners with such corrected transcripts, although we note that the parties in the present case dispute whether such a failure occurred here.

Shewchun, in fact, does not point to *any* differences, much less any prejudicial changes, between the preliminary and final copies of the IJ's decision. The BIA determined, and Shewchun does not deny, that the IJ's only edits "were grammatical in nature." In a belated effort to overcome the weakness of his contention, Shewchun has submitted a post-argument letter to the court under Rule 28(j) of the Federal Rules of Appellate Procedure. He argues in the letter that he complied with the proper procedures set forth in the BIA Practice Manual, as described by *Bulatovic*, 351 F. App'x at 983-84, for raising claims of prejudice. Shewchun points to 16 specific objections that he raised to the BIA concerning the IJ's decision. But he acknowledges in his Rule 28(j) letter that these 16 issues are common to both the preliminary and final copies of the IJ's decision.

These issues, in other words, deal with his objections to the substance of the IJ's decision rather than with the ways in which he was allegedly prejudiced by discrepancies between the two copies. So even assuming that Shewchun's enumerated objections to the IJ's decision, which he raises for the first time on appeal in his Rule 28(j) letter, are properly before us, he has still failed to show any prejudice resulting from the IJ's alleged failure to timely furnish him with a corrected copy of the oral decision. We therefore reject Shewchun's due process claim concerning his inaccurate copy of the administrative record and deny his motion to correct the same.

**D.     IJ's denial of Shewchun's motion for recusal**

Shewchun's final issue on appeal is the BIA's denial of his claim that IJ Nettles committed reversible error by refusing to recuse herself in light of her prior position as Chief Counsel in the Detroit District for ICE.  Judges of the United States must disqualify themselves from proceedings in which their "impartiality might be reasonably questioned," 28 U.S.C. § 455(a), as well as where they have, through governmental employment, acted "as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case," *id.* at § 455(b)(3). An IJ's having previously served as Chief Counsel while an alien's case was pending does not by itself require recusal because the "Chief Counsel of a large office is unlikely to play any role in routine decisions of this kind." *Petrov v. Gonzales*, 464 F.3d 800, 803 (7th Cir. 2006) (holding that the IJ was not required to recuse himself even though he was Chief Counsel when ICE decided to seek removal), *cited with approval in Abdulahad v. Holder*, 581 F.3d 290, 296 (6th Cir. 2009).  Rather, "the alien must produce evidence that his case is the rare one in which the head of an office took part in a routine action." *Petrov*, 464 F.3d at 803.

IJ Nettles declined to recuse herself because she "did not have any direct or even indirect contact with [Shewchun's] case" in her former position.  She in fact had "no recollection whatsoever of [Shewchun] or his claims for relief."  In contrast, IJ Hacker, who was the INS's District Counsel in Detroit prior to becoming an IJ, did recuse herself earlier in these proceedings because she "either handled or was directly involved in a decision-making process" in Shewchun's case.  Unlike IJ Nettles, IJ Hacker recalled having discussed Shewchun's case with an INS trial attorney.

Shewchun responds by pointing to a document that was filed against him during the time that IJ Nettles served as Chief Counsel of ICE's Detroit District.  But this document was signed by an Assistant Chief Counsel, not by IJ Nettles.  Shewchun's other allegations similarly fail to rebut the BIA's finding that nothing in the record suggests that IJ Nettles was involved in this case during the time that she served as Chief Counsel.  Moreover, rather than make any specific claims of bias on the part of IJ

Nettles, Shewchun makes only passing references to various issues that he has not properly preserved for appeal.

### III.  CONCLUSION

For all of the reasons set forth above, we **DENY** Shewchun's petition for review and **DENY** his motion to correct the administrative record.